UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUZANNE C. LANGFORD,

                    Plaintiff,

       -against-

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 30, et al.,

                 Defendants.

10 Civ. 1644 (RJH)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

Richard J. Holwell, District Judge:

      Plaintiff Suzanne C. Langford filed this action on March 1, 2010, asserting claims for race and sex discrimination under Title VII and violations of 42 U.S.C. § 1981, as well as violations of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* Langford's claims arise out of her employment with defendant Starrett City, Inc. ("Starrett") in an apprenticeship program run by defendant International Union of Operating Engineers, Local 30 ("Local 30"). Now before the Court are defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(3), 12(b)(6), the timing and administrative-exhaustion provisions of Title VII, and the doctrine of federal preemption. For the reasons that follow, defendants' motions to dismiss are GRANTED in part and DENIED in part.

**BACKGROUND**

For the purposes of this motion, the following facts are taken as true.

I.   **Alleged Discriminatory Acts During Langford's Employment with Starrett**

Langford, an African American woman, began her work with Starrett on July 23, 2003, as a summer helper.  (Compl. ¶ 29.)[1]  She was accepted into Local 30's apprenticeship program on March 1, 2004.  (*Id.* ¶ 28.)  The apprenticeship program consists of training and an assignment to an employer with which Local 30 has a collective-bargaining agreement ("CBA"); it has a maximum duration of forty-two months.  (*Id.*)  The training provided by the apprenticeship program was meant to qualify apprentices for employment opportunities through the union hiring hall or the place of apprenticeship.  (*Id.*)

Langford received her work assignments from defendant Michael Sullivan, a white male and Local 30's shop steward, as well as other engineers and mechanics.  (*Id.* ¶¶ 10, 30.)  The complaint details several sets of events, alleged to be motivated by Langford's sex or race, that occurred throughout her period of employment.  First, it alleges that Sullivan and other white male engineers and mechanics refused to train Langford during her apprenticeship, even though they did train white apprentices.  (*Id.* ¶¶ 31-34.)  Second, during Langford's employment, Sullivan used racially offensive terms when referring to African Americans, including calling a black engineer a "'monkey' or 'gorilla' 'who should be up a tree sucking on a banana,' calling a black female a 'black bitch,' and commenting that Oprah Winfrey should have 'died in a plane crash.'"  (*Id.* ¶ 47.)   Third, Sullivan and other white male engineers and mechanics would berate Langford, verbally abuse her, and give her disparate work assignments based on her sex or race.  (*Id.* ¶ 35.)

---

[1] References to the Complaint are to the Amended Complaint, filed July 15, 2010.

Fourth, Langford was assigned a number of unenviable work tasks.  In December 2004, Langford was directed to clean up toxic chemicals that an operating mechanic had spilled.  (*Id.* ¶ 36.)  In the winter of 2005, Sullivan, from inside a control room, ordered Langford to walk an ice-covered catwalk to close a valve.  (*Id.*)  Langford walked the catwalk, but turned back before reaching the valve, "terrified" for her safety.  (*Id.*)  Langford asked an African-American engineer, Joe Land, about the order, and Land told her that "under no circumstances should she have been ordered onto the tower or the catwalk" because the valve could have been controlled from inside the control room.  (*Id.*)  Langford was also required to clean the men's locker room, in which photographs were displayed depicting women in various states of undress and sexually suggestive attire; her male counterparts were not required to clean the women's locker room, in which male employees would vomit and urinate.  (*Id.* ¶¶ 37, 38.)

## II.  Complaints to Local 30 and Starrett Officials

Langford was not advised of a non-discrimination or anti-harassment policy or about any procedures Starrett had adopted for filing a complaint about discrimination or harassment.  (*Id.* ¶ 49.)  Nevertheless, Langford did complain to Local 30 and Starrett officials during her employment, although nothing was done in response to her complaints.

From May to August 2004, Langford complained to Rickford John, Starrett's Assistant Plant Director, about the conditions in the women's locker room, but nothing was done to correct them.  (*Id.* ¶ 39.)  On March 14, 2005, she complained to John about how Sullivan yelled at her, threatened her, verbally abused her, and treated her differently because of her race and sex.  (*Id.* ¶ 43.)  John remarked, "It seems as if things are always being done to people of color in this place," but did nothing to remedy Langford's complaint.  (*Id.* ¶ 41.)  Throughout her employment, Langford complained to John about the "abuse, hostility, failure to train, the

sexually suggestive photographs, hostile work environment and disparate treatment she suffered at the hands of her co-workers, supervisors, and fellow union members, to no avail." (*Id.* ¶ 44.) She also complained throughout her employment about being required to clean the men's work stations on a regular basis, since that work should have been assigned to the individual who had been on duty at the time, but no action was taken on those complaints either. (*Id.* ¶ 45.)

On May 31, 2005, Langford complained to Erol Ozkirbas, director of Starrett's power plant, about the sexually suggestive pictures in the men's locker room, and suggested sexual harassment training classes; no action was taken. (*Id.* ¶¶ 41, 42.) In March 2005, Langford complained to Local 30's assistant shop steward, Bill Fallon, that she was subjected to harassment, verbal abuse, and had been treated in a disrespectful manner by a former white male apprentice and boiler operator, Brendan Benn. (*Id.* ¶ 50.) Fallon directed her to write a complaint, and told her that he would handle it. (*Id.*) On March 11, 2005, in response to her complaint to Fallon, Brendan McPartland, a business agent of Local 30, interrogated Langford, verbally berated her, and suggested that she could be disciplined for insubordination. (*Id.* ¶ 51.) Langford then decided that it would be fruitless to complain further to Local 30 officials. (*Id.* ¶ 52.)

### III. Departure from Starrett

Langford's forty-two month apprenticeship period was scheduled to end in September 2007, (*Id.* ¶ 56), but Langford experienced further difficulties leading up to the end of her apprenticeship. On April 24, 2006, she advised Salim Qureshi, Starrett's Director of Technical Services, that she was applying for an open operator position. (*Id.* ¶ 53.) Qureshi, a native of India, pointed to his own skin and said, "It's all about color in this place." (*Id.*) He repeated that remark after a white male was hired. (*Id.*) On May 17, 2006, Langford applied for a position as

a boiler operator at Starrett, but was turned down on the grounds that she needed a refrigeration license.  (*Id.* ¶ 54.)  Langford believes that the person hired for the position, a white male with less experience, did not have such a license.  (*Id.*)  On April 30, 2007, Langford applied for a position as a maintenance mechanic.  (*Id.* ¶ 64.)  Starrett administered a test for the position, and hired a white male with less experience than Langford.  (*Id.*)

Beginning in March 2006, Local 30 began to insist that Langford's apprenticeship had ended and that she had to report to the union hiring hall for reassignment.  On March 30, 2006, December 13, 2006, and in March 2007, Howard Kelly, Director of Local 30's Apprenticeship Training Program, sent Langford letters advising her that she was no longer in the apprenticeship and directing her to report for reassignment.  (*Id.* ¶ 55.)  On December 22, 2006, Langford went to the Local 30 hiring hall and informed Kelly that her apprenticeship did not end until September 2007; Kelly told her that she "must make room for others."  (*Id.* ¶ 57.)  Langford asked Kelly whether other white male apprentices who had started at the same time were being told similar things; Kelly had no answer, and these apprentices indeed had not been told similar things.  (*Id.*)  Langford complained to John that Local 30 was trying to get her fired; John responded that "things happen to people of color," but did nothing to address Langford's complaint.  (*Id.* ¶ 59.)

On March 8, 2007, Sullivan told Langford to report to the union hiring hall as her apprenticeship period had ended.  (*Id.* ¶ 60.)  When Langford protested that she had six months remaining in her apprenticeship, Sullivan told her to go the union hall, and if she was hired by another employer, she "better not turn down that job or else [she was] going to have problems with the Union."  (*Id.*)  Sullivan repeated similar remarks to Langford on March 30, 2007 and

May 1, 2007.  (*Id.* ¶¶ 61, 68.)  Langford asked Sullivan for a reference letter on March 30, 2007; Sullivan declined, although he had given white males such letters.  (*Id.* ¶ 62.)

On April 12, 2007, Sullivan filed a grievance against Langford with Starrett asserting that her apprenticeship period had expired.  (*Id.* ¶ 65.)  The next day, John Friel, director of Starrett's power plant,[2] wrote a memo to Qureshi and Vernon Douglas, director of Starrett's Human Resources Department, advising them that the term did not end until September 2007, but that Sullivan insisted on filing the grievance at the direction of union "higher-ups."  (*Id.* ¶ 66.) Starrett rejected the grievance, concluding that Langford's time as a summer helper was not part of the apprenticeship period and never had been in any previous case.  (*Id.* ¶ 67.)

On May 8, 2007, Langford complained to John that the union was pushing her out of her job, but nothing was done in response to her complaint.  (*Id.* ¶ 69.)  Because Langford felt that her working conditions were intolerable, and because she felt that neither Local 30 nor Starrett would do anything to correct those conditions, she resigned on May 20, 2007.  (*See id.* ¶¶ 70-73.) Langford reported to the Local 30 hiring hall and secured a lesser-paying position that she alleges is not commensurate with her qualifications.  (*Id.* ¶ 74.)  Since then, Langford has made multiple requests to Local 30 to be placed in a position commensurate with her qualifications, but Local 30 has been unresponsive to these requests except to place her on a "transfer list" on which she has been listed for three years.  (*Id.* ¶ 75.)

### IV. Administrative Proceedings

On February 1, 2008, Langford filed complaints against Starrett (the "Starrett Complaint") and Local 30 (the "Local 30 Complaint") with the New York State Department of Human Rights ("NYSDHR").  (*See* Compl. Exs. A, B, F, G.)  Both complaints checked the

---

[2] It appears that Friel replaced Erol Ozkirbas, the director of Starrett's power plant in 2005, at some point between May 31, 2005, and April 13, 2007.  (*Compare* Compl. ¶ 41 *with* Compl. ¶ 66.)

boxes indicating that Local 30 and Starrett were discriminating against her based on her race, color, and sex; neither complaint checked the box indicating "Retaliation for Opposing Discrimination."  (*See id.* Exs. A, F.)  Both complaints peg the most recent act of discrimination as occurring on May 20, 2007.  (*Id.*)  The Starrett Complaint describes Langford's exposure to "sexually explicit pictures" in the men's locker room, a "hostile work environment," "racial epithet," and Starrett's failure to promote her to an operator's position based on her lack of a refrigeration license.  (*See id.* Ex. A at 3.)  The Local 30 Complaint contains a more extensive description of discriminatory events.  In addition to reciting the events described in the Starrett Complaint, it details Sullivan and Local 30's disparate treatment of Langford, including her being assigned cleaning work that men should have done and being sent unnecessarily to turn off a valve in icy conditions; the failure of Local 30 officials to answer Langford's training-related questions; and Local 30's attempts at removing Langford from her position.  (*See id.* Ex. F at 4.)

NYSDHR found that there was probable cause with respect to both complaints that Local 30 and Starrett engaged in the unlawful discriminatory practices of which Langford complained. (*See id.* Exs. C, H.)  On February 2, 2010, Langford advised NYSDHR of her intention to pursue her claims in federal court and requested that both the Starrett and Local 30 Complaints be dismissed.  (*Id.* ¶¶ 15, 23.)  On February 8, 2010, the United States Equal Employment Opportunity Commission ("EEOC") issued Notice of Right to Sue letters for each complaint. (*Id.* Exs. E, J.)  On February 12, 2010, Administrative Law Judge Thomas S. Protano issued Recommended Orders of Dismissal for Administrative Convenience for the Starrett and Local 30 Complaints, which NYSDHR adopted on March 15, 2010.  (*See id.* ¶¶ 16, 24, Exs. D, I, J.)

Langford filed suit in this Court on March 1, 2010.  Defendants filed their motions to dismiss on June 25, 2010.

### V. Claims and Relief Sought

Based on the foregoing facts, Langford asserts a series of claims arising out of the alleged discrimination she experienced at Starrett.

### A. Title VII Claims

Although styled as two claims for relief, (*see id.* ¶¶ 77-98), one for race discrimination and one for sex discrimination, each Title VII "claim" contains multiple claims within it.  The race discrimination section contains eight claims, including six against Local 30 and two against Starrett.  The Local 30 claims are: (1) a "pattern and practice" claim of operating the apprenticeship program in a discriminatory fashion; (2) a failure to train claim; (3) a hostile work environment claim; (4) a constructive discharge claim; (5) a denial of job referral opportunities claim; and (6) a retaliation claim.[3]  (*Id.* ¶¶ 78-84.)  The Starrett claims are: (1) a hostile work environment claim; and (2) a failure to hire claim.  (*Id.* ¶¶ 85-86.)  The sex discrimination also contains eight claims that are structured in the same manner as the race discrimination claims. (*Id.* ¶¶ 89-98.)

---

[3] The Court notes that it is unclear exactly how many of these claims are intended to be separate claims.  The Amended Complaint lists all possible race discrimination claims as a single claim with the heading "Title VII – Disparate Treatment – Race," even though some of the paragraphs within this single claim, such as those alleging that Local 30 created a "hostile work environment," "engaged in a pattern of conduct that resulted in the constructive discharge of Plaintiff," and "retaliated against Plaintiff for exercising her rights to complain and seek redress for violations of Title VII," (*See* Compl. ¶¶ 78-87), clearly articulate separate claims.  Additionally, all such claims, if indeed there are multiple ones, are alleged to be continuing violations under Title VII, even though some, such as constructive discharge, clearly cannot be continuing violations.  (*Id.* ¶ 87.)  The Court, therefore, interprets each paragraph under the two Title VII discrimination "claims" to be asserting a separate claim, except where the paragraph is entirely generic.  (*See id.* ¶¶ 79, 90.)

This confusion apparently extends to the parties' understanding as well.  For example, Local 30 appears to consider the failure-to-train claim to be entirely subsumed by the hostile work environment claim, (*see* Local 30 Reply at 3), a conflation not helped by the plaintiff's treatment of defendant's alleged "failure to train" both as an argument in support of the timeliness of her hostile work environment claim and as a separate claim in its own right. (*See* Pl.'s Mem. at 17.)  Local 30 also appears to ignore entirely plaintiff's "pattern or practice" claim, and Starrett appears to be arguing that a constructive discharge claim against Starrett should be dismissed when no such claim appears to exist.  (*See* Starrett Mem. at 5.)

**B.  Section 1981 Claims**

Langford's section on her claims based on 42 U.S.C. § 1981 contains four claims: (1) a claim against Local 30 and Sullivan for depriving her of her rights as a union member to be free from discriminatory conduct by other union members; (2) a claim against all defendants that they deprived her of her rights as an apprentice to be in an apprenticeship program free from discriminatory conduct in the workplace; (3) a hostile work environment claim against all defendants; and (4) a claim of constructive discharge.  (Compl. ¶¶ 100-104.)

**C.  State and Local Claims**

Langford also asserts claims against Starrett and Local 30 under the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.*, and against all defendants under the New York City Human Rights Law, N.Y. City Administrative Code § 8-107 *et seq.* for the "depriv[ation]" of her "rights secured by" those laws.  (*Id.* ¶¶ 106, 108.)

**D.  Relief Sought**

Based on these claims, Langford seeks: (1) compensatory damages in the amount of one million dollars; (2) an award of back pay; (3) an award of front pay; (4) punitive damages in the amount of three million dollars; and (5) costs, disbursements, expert fees, and attorneys' fees.

**DISCUSSION**

**I.  Venue**

As a threshold matter, both Local 30 and Starrett argue that venue is improper in this District.  (Local 30 Mem. at 24-25; Starrett Mem. at 4-5.[4])  Title VII's venue provision provides that:

> an action may be brought in any judicial district in the State in which the unlawful
> employment practice is alleged to have been committed, in the judicial district in

---

[4] Defendants Starrett and Sullivan submitted a joint motion to dismiss.  References to arguments made by Starrett are to those made in that motion.

which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).  Defendants contend that because the Starrett power plant and Starrett's employment records are in Kings County, and because plaintiff and Sullivan live in Queens County, this District has "no connection" with the case, and the case should be transferred to the Eastern District of New York.  (*See* Local 30 Mem. at 25; Starrett Mem. at 5-6.)  Plaintiff argues that venue is proper because a Title VII action may be brought "in any judicial district in the *State* in which the unlawful employment practice is alleged to have been committed."  (Pl.'s Opp'n at 35 (emphasis in original).)  The Court agrees with plaintiff.

"The Courts of this Circuit have construed [the Title VII venue] provision to mean that venue is not limited to the particular district in which the alleged unlawful acts occurred, but rather that venue is proper, as the plain language of the statute provides, in *any* judicial district *in the State* in which the alleged unlawful acts occurred."  *Banfield v. UHS Home Attendants, Inc.*, No. 96 Civ. 4850 (JFK), 1997 WL 342422, at *1 (S.D.N.Y. June 23, 1997) (emphasis in original); *see also Cellamare v. Milbank, Tweed, Hadley & McCloy LLP*, No. 03-CV-0039 (FB)(LB), 2003 WL 22937683, at *3 (E.D.N.Y. Dec. 2, 2003) ("Milbank contends that venue is not proper in the Eastern District . . . .  [T]he Eastern District, as one of New York's four judicial districts, is a proper venue for Cellamare's Title VII claims."); *Rodriguez v. Chandler*, 641 F. Supp. 1292, 1302 (S.D.N.Y. 1986).  Accordingly, because the Complaint alleges discriminatory acts that occurred in the State of New York, venue of plaintiff's claims lies in the Southern District, even though the alleged acts took place in the Eastern District.

Defendants cite *Bolar v. Frank*, 938 F.2d 377, 378-79 (2d Cir. 1991), for the proposition that the Title VII venue provision "evinces congressional intent that venue for actions brought under the Act be limited to district courts having a connection with the alleged discrimination." (Local 30 Mem. at 25.)  Because the facts in this case connect with the Eastern District, not the Southern District, defendants argue that venue is proper only in that district.  But by the plain language of the statute, Congress has already evinced a judgment that the district courts with a "connection" with the discrimination are those within the same state as discriminatory conduct. It is not for this Court to make a contrary judgment.  Accordingly, venue is proper here.

## II.  Standards of Review

Local 30 and Starrett have argued that Langford's Title VII claims are barred as untimely, for failure to exhaust administrative remedies, or for failure to state a claim.  Before analyzing these arguments, the Court recounts the standards by which such arguments must be measured.

### A.  Title VII's Statute of Limitations

In New York, where the NYSDHR addresses complaints of employment discrimination, any complaint must be filed with the NYSDHR within 300 days of the alleged discriminatory act.  *See* 42 U.S.C. § 2000e-5(e)(1); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010).  Filing a complaint within this period is "a precondition to filing a Title VII claim in federal court."  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).  Langford filed complaints against Starrett and Local 30 with the NYSDHR on February 1, 2008.  As such, claims that occurred 300 days prior, on or before April 7, 2007, would be timely under the statute.

"When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the

earlier conduct." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004).  "With respect to claims based on termination, failure to promote, denial of transfer, or refusal to hire, section 2000e-5(e)(1) precludes recovery for *discrete* acts of discrimination or retaliation that occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period." *McGullam*, 609 F.3d at 75 (internal citations and quotation marks omitted) (emphasis in original).  Such claims must be alleged to have occurred within the 300-day period.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

But "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.  The 'unlawful employment practice' therefore cannot be said to occur on any particular day." *Morgan*, 536 U.S. at 115 (internal citation omitted).  Therefore, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105.  The Second Circuit has equated this category of claims with the "continuing violation" doctrine.  *See Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) ("The Court applied the continuing violation doctrine because a hostile work environment claim challenges 'repeated conduct' that 'occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" (quoting *Morgan*, 536 U.S. at 115)).

## B. Administrative Exhaustion

In Title VII claims, "[e]xhaustion is ordinarily 'an essential element'" of the claim. *Williams v. New York City Housing Authority*, 458 F.3d 67, 70 (2d Cir. 2006).  In this context, "exhaustion" means that "a plaintiff typically may raise in a district court complaint only those

claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001) (quoting *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993)).

The Second Circuit has recognized three ways, sometimes called the three "*Butts* exceptions," that a claim can be "reasonably related to" the allegations in the EEOC charge. First, "a claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Williams*, 458 F.3d at 70. "This exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Deravin*, 335 F.3d at 201 (quoting *Butts*, 990 F.2d at 1402). "The central question is whether the complaint filed with the EEOC gave that agency 'adequate notice to investigate discrimination on [the] bases'" alleged in the complaint. *See Williams*, 458 F.3d at 70 (quoting *Deravin*, 335 F.3d at 202). Second, a claim is reasonably related if it "alleg[es] retaliation by an employer against an employee for filing an EEOC charge." *Williams*, 458 F.3d at 70 n.3. Third, a claim is reasonably related if it "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.*

## C.  Failure To State a Claim

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir. 2009). The complaint's allegations, however, "must be enough to raise a right of relief above the

13

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Only a "plausible

claim for relief survives a motion to dismiss."  *LaFaro v. New York Cardiothoracic Group,*

*PLLC*, 570 F.3d 471, 476 (2d Cir. 2009).  Thus courts are "not bound to accept as true a legal

conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause

of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S.Ct.

1937, 1949-50 (2009) (internal quotation marks omitted).

    For complaints asserting discrimination claims, "[t]he *Iqbal* plausibility standard applies

in conjunction with employment discrimination pleading standards."  *Jackson v. NYS Dep't of*

*Labor*, 709 F. Supp. 2d 218, 223-24 (S.D.N.Y. 2010).  Such complaints "need not allege

'specific facts establishing a prima facie case of discrimination' . . . to survive a motion to

dismiss."  *Boykin v. KeyCorp*, 521 F.3d 202, 212 (2d Cir. 2008) (quoting *Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 508 (2002)).  Rather, these complaints need only "include a short and plain

statement of the claim . . . [that] give[s] the defendant fair notice of what the plaintiff's claim is

and the grounds upon which it rests."  *Swierkiewicz*, 534 U.S. at 512 (internal quotation marks

omitted).  "[T]he *Swierkiewicz* holding applies with equal force to any claim . . . that the

*McDonnell Douglas* framework covers," including claims of retaliation, disparate treatment, and

hostile work environment, and retains its vitality in the wake of *Twombly* and *Iqbal*.  *Boykin*, 521

F.3d at 213; *see also* David L. Noll, *The Indeterminacy of* Iqbal, 99 Geo. L.J. 117, 144-45 (2010)

(noting that "some courts and commentators have questioned whether *Swierkiewicz* remains

good law after *Iqbal*" but that "[t]he better view is that *Iqbal* left the essential holding of

*Swierkiewicz*—that the complaint in that case was sufficient—intact").

### III. Application

With these principles in mind, the Court analyzes each claim to determine whether it is barred by Title VII's statute of limitations, administrative exhaustion provision, or Federal Rule of Civil Procedure 12(b)(6).

#### A. Claims Against Local 30

#### i. Hostile Work Environment

Local 30 argues that Langford's hostile work environment claims are time-barred, as all events contributing to the claims occurred more than 300 days before her NYSDHR complaint. (*See* Local 30 Mem. at 11; Local 30 Reply at 2-4.)  But Local 30 and Langford disagree on what events may properly be considered part of her hostile work environment claim.  Local 30 argues that the only acts that could salvage Langford's claim from being time-barred are the April 12, 2007, grievance filed by Sullivan and the May 1, 2007, threat Sullivan made.  (Local 30 Reply at 3.)  Plaintiff, however, argues that because she alleges that "actions were taken *throughout the period of her employment* . . . including . . . the abuse, threats, failure to train, sexually suggestive photographs, and disparate work assignments, the use of racially derogatory terms, and the failure of the company to remedy the complaints," and because part of her employment falls within the applicable 300-day period, her hostile work environment claim is timely under *Morgan*.  (Pl.'s Opp'n at 17 (emphasis added).)  According to Local 30, the language in such allegations is "mere[ly] conclusory" and not "sufficient to overcome the time and filing requirements of Title VII."  (Local 30 Reply at 3 (citing *Patterson v. General Motors Corp.*, 631 F.2d 476, 484 (7th Cir. 1980)).)

The case law addressing this sort of language indicates that allegations of discriminatory conduct including language akin to "throughout her employment" are properly included in

hostile work environment claims. *See Stathatos v. Gala Resources, LLC*, No. 06 Civ. 13138 (RLC), 2010 WL 2024967, at *7 (S.D.N.Y. May 21, 2010) (denying motion to dismiss hostile work environment claim as time-barred because plaintiff's "allegations are accompanied by phrases like 'every day,'" which "indicate[d] continuous exposure to sexually charged behavior and offensive comments that pre-date and postdate" the operative date); *Drew v. Plaza Construction Corp.*, 688 F. Supp. 2d 270, 279 (S.D.N.Y. 2010) (finding that plaintiff's hostile work environment claims were not time-barred because the complaint alleged that defendant "treated him in a discriminatory fashion that created a hostile work environment throughout his entire period of employment," which overlapped with the period within the statute of limitations); *EEOC v. Rotary Corp.*, 297 F. Supp. 2d 643, 659-60 (N.D.N.Y. 2003) (indicating that plaintiff's claims were timely when her "undated allegations [were] all introduced or accompanied by a phrase[s] . . . implying that the alleged conduct occurred throughout her employment"). Although it appears that some of plaintiff's arguments about the timeliness of her hostile work environment claims may be better directed toward discrete-act claims, plaintiff has still alleged that throughout her employment, Sullivan used racially derogatory terms and required her to clean the men's locker room, which contained sexually suggestive photographs. (Compl. ¶¶ 37, 47.)

Presumably, Local 30's argument that these allegations are too "conclusory" to satisfy Title VII's filing requirement is grounded in the lack of concrete dates in the Complaint.[5] But "numerous courts in this Circuit have held that a Title VII complaint should not be dismissed for failure to plead the dates of the alleged discrimination." *EEOC. v. Elmer W. Davis, Inc.*, No. 07-CV-6434 CJS, 2008 WL 4415177, at *6 (W.D.N.Y. Sept. 24, 2008). Because the period of her

---

[5] Local 30 does not elaborate on what exactly is "merely conclusory" about Langford's allegations, but instead states flatly that "Plaintiff is wrong" regarding whether allegations of conduct occurring throughout the period of employment can contribute to a hostile work environment claim. (*See* Local 30 Reply at 3-4.)

16

employment overlaps with the 300-day period, and these allegations of racially charged remarks and exposure to sexually suggestive material sufficiently "contribute to" a hostile work environment claim based on sex or race, Langford's hostile work environment claims are timely.

Local 30 also argues that Langford's hostile work environment claim fails as a matter of law because "Starrett was plaintiff's employer and, therefore, was responsible for correcting any hostile environment created by its employees."  (Local 30 Mem. at 11.)  In support of this argument, Local 30 cites *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656 (7th Cir. 2003), which held that a union has no "affirmative duty . . . to investigate and rectify discrimination by the employer."  334 F.3d at 660.  Plaintiff counters with *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650 (7th Cir. 2006), which found that *Pipefitters* stood only for the proposition that "§ 703(a) makes employers rather than unions answerable for terms and conditions in the workplace, [but] § 703(d) makes both employers and unions answerable for the administration of joint training and apprenticeship programs."  437 F.3d at 652.  In reply, Local 30 attempts to distinguish *Maalik* by pointing out that there, "the plaintiff . . . complained to her union that coworkers refused to train her."  (Local 30 Reply at 4.)  Here, "on the other hand, the only thing plaintiff complained to Local 30 about . . . was being 'treated in a disrespectful manner.'"  (*Id.* (quoting Compl. ¶ 50).)  Therefore, Local 30 contends that "plaintiff failed to put [it] on notice of her alleged various issues concerning workplace discrimination" and no basis for the union's liability exists.  (*Id.*)

"In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that 'the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' and (2) that there is a 'specific basis for imputing the conduct creating the hostile work environment to the employer.'"

*Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold v. New York*, 366 F.3d 138, 149-50 (2d Cir. 2004)).  The Court understands Local 30's argument and citation of *Pipefitters* as challenging the sufficiency of Langford's pleadings as to the second prong.  Local 30 does not appear to be contesting whether § 703(d) of Title VII provides a valid basis for a hostile work environment claim.[6]

Rather, Local 30's argument on this front assumes that "put[ting] Local 30 on notice" of discrimination issues is a necessary condition of a hostile work environment claim.  (Local 30 Reply at 4.)  Having failed to satisfy this necessary condition, it argues, Langford's claim must fail as a matter of law.[7]  Where the conduct creating the hostile work environment is attributable only to co-workers, not supervisors, Local 30's argument would carry weight.  *See Duch*, 588 F.3d at 762; *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) ("Because the harassment here was by a co-worker and not a supervisor, the plaintiffs must demonstrate that [the defendant] 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996))).  But "[w]here the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminate[d] in a tangible employment action against the employee; if it did, the employer will, *ipso facto,* be vicariously liable."  *Petrosino*, 385 F.3d at 225 (internal citation omitted).  "In the absence of such tangible action, an employer will still be liable . . . unless it successfully establishes as an affirmative defense that (a) it exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) the plaintiff employee

---

[6] From a cursory review of the case law, it appears that it does.  *See, e.g.*, *Herrera v. Int'l Brotherhood of Electrical Workers, Local No. 68*, 228 F. Supp. 2d 1233, 1243 (D. Colo. 2002) ("Plaintiff may assert a sexual discrimination claim under 42 U.S.C. § 2000e-2(d) . . . .").

[7] Local 30 argues that the failure to plead this necessary condition distinguishes this case factually from *Maalik*, but cites no authority for it actually being a necessary condition.  (*See* Local 30 Reply at 4.)

18

unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (internal quotation marks omitted). "[A]pplying these agency principles to the Union serves the purposes of Title VII by increasing the protection for employees against discrimination by unions in the workplace." *Agosto v. Correctional Officers Benevolent Ass'n*, 107 F. Supp. 2d 294, 308 (S.D.N.Y. 2000).

Here, Langford has alleged that "at all times relevant hereto, [she] received her work assignments from Defendant Sullivan, who was Local 30's shop steward, and other operating engineers and operating mechanics." (Compl. ¶ 30.)  The "racially derogatory and offensive terms including . . . calling a black female a 'black bitch'" alleged to have been used throughout Langford's employment are attributed to Sullivan. (Compl. ¶ 47.)  Because the Complaint alleges that Sullivan exercised supervisory authority over Langford, Local 30's contention that it had to be put on notice in order for her hostile work environment claims to survive is erroneous. Instead, Local 30 is vicariously liable for Sullivan's actions.  Whether or not Sullivan's actions resulted in tangible employment action against Langford is irrelevant at this point, since Local 30 has not asserted either of the affirmative defenses available to it, and would therefore still be vicariously liable.

### ii.  Failure To Train

Local 30 also argues that Langford's failure to train claim cannot be timely because "a 'failure to train' claim deals with a discrete act of discrimination that is 'not susceptible to a continuing violation analysis.'" (Local 30 Reply at 3 (quoting *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 483-84 (3d Cir. 1997)).)  The question of whether a failure to train is a discrete act or a continuing violation under *Morgan* is a difficult one.  *See Herrera v. Int'l Brotherhood of Electrical Workers, Local No. 68*, 228 F. Supp. 2d 1233, 1241 n.3 (D. Colo.

2002) ("[T]he . . . question of whether a failure to train is a 'discrete act of discrimination' under the Supreme Court's analysis in *Morgan* . . . is a difficult question because if, for example, an employer failed to train an individual based on discriminatory reasons, this could have a continuing effect on the individual's work throughout his employment.").  Some courts in this Circuit have held that "even when repeated denials of promotions and training opportunities are alleged, such denials do not constitute a continuing violation so as to render the earlier denials timely; rather, the denial of both promotions and training opportunities are considered discrete actions."  *Barrow v. Ford Motor Co.*, No. 03-CV-621A, 2007 WL 1655660, at *9 (W.D.N.Y. June 5, 2007); *see also Rechichi v. Eastman Kodak Co.*, No. 02-CV-6249-CJS, 2004 WL 1698333, at *5 (W.D.N.Y. Jan. 21, 2004) (noting that "discrete acts of discrimination" includes acts "such as discriminatory pay, failure to promote, and failure to train").  But others have noted that "[f]ailure to train, like failure to promote, is a discrete incident of discrimination *unless* plaintiff alleges a continuing violation."  *Gilford v. City of New York*, No. 03 Civ. 0091 (SHS), 2004 WL 1574695, at *4 (S.D.N.Y. July 14, 2004) (emphasis added).  Langford may have alleged a continuing violation in this case, where the failure-to-train claim arises in the context of an apprenticeship program, the entire purpose of which is to train employees.

But the Court need not decide this question at this early stage of the litigation. Regardless of whether the failure-to-train claim states a discrete act or a continuing violation, the Complaint asserts that it occurred throughout the period of Langford's employment.  As discussed above, this indicates that some part of the failure to train happened during the 300-day window.  It is inappropriate, therefore, to dismiss the claim as time-barred.

### iii. Constructive Discharge

Local 30 does not argue that Langford's constructive discharge claim is time-barred. Rather, Local 30 argues that Langford failed to exhaust her administrative remedies with respect to this claim because she did not "allege in her EEOC charge either that she was constructively discharged or that Local 30 was somehow responsible for the constructive discharge." (Local 30 Mem. at 13.) Presumably, Local 30's position is that Langford's allegations of a hostile work environment are insufficient to exhaust her remedies.[8] Plaintiff does not respond specifically to this argument, but generally argues that the Court should interpret her allegations as "reasonably related" to the Local 30 Complaint under the *Butts* exceptions.

"There is conflicting authority within the Second Circuit as to whether failure to exhaust administrative remedies bars a constructive discharge claim in a case . . . where a plaintiff's EEOC complaint alleged a hostile work environment but not constructive discharge." *Stofsky v. Pawling Central School District*, 635 F. Supp. 2d 272, 300 (S.D.N.Y. 2009). Neither side cites any cases illuminating this issue. Nevertheless, the Court finds that the constructive discharge claim is "reasonably related" to the Local 30 Complaint. Indeed, the Court would be hard-pressed not to come to the conclusion that the Local 30 Complaint did not give the agency "adequate notice" of her constructive-discharge claim, given that the agency actually did investigate that claim. (*See* Compl. Ex. H at 3 ("Complainant was nevertheless constructively discharged from Starrett City May 20, 2007 as a result of a hostile work environment and threats from Respondent Union officers and agents.")); *see also EEOC. v. Nichols Gas & Oil, Inc.*, No. 05-CV-6482 CJS, 2006 WL 692345, at *3 (W.D.N.Y. Mar. 13, 2006) (denying motion to dismiss retaliation claim as unexhausted because "the EEOC actually investigated whether

---

[8] The above-quoted sentence constitutes Local 30's full argument on this point.

defendant had retaliated").  Accordingly, Langford's constructive-discharge claim is not barred for failure to exhaust administrative remedies.

### iv. Denial of Job Referral Opportunities and Retaliation

NYSDHR's report contains no such references to the denial of job opportunities or retaliation alleged in the Complaint.  Local 30 contends that the because the NYSDHR complaint alleged that the most recent act of discrimination was on May 20, 2007, and because Langford did not check the box for "retaliation," she "clearly did not charge Local 30 with engaging in any unlawful conduct during the more than eight month interval between the effective date of her resignation from Starrett and the day she filed the charge."  (Local 30 Reply at 5.)  With respect to the denial of job referral opportunities, plaintiff argues without citation that because "the denial was effectuated by the discriminatory manner in which the apprenticeship program was operated" and because "the charge was filed after she had been constructively discharged, it is likely that the conduct complained of herein would fall within the scope of EEOC investigation." (Pl.'s Mem. at 24.)  Plaintiff further argues that "the failure of the union to consider her for other positions was carried out in the same manner as the discrimination alleged in the charge, *i.e.*, 'passed over for promotion.'"  (*Id.*)

Plaintiff's arguments are not persuasive.  Given that the last date of discrimination indicated corresponds to the last date Langford was employed at Starrett, and the complete dearth of any reference to any post-Starrett conduct in the Local 30 Complaint, it is difficult to see why it is "likely" that the failure to refer Langford to other jobs after her resignation from Starrett would come within the scope of an EEOC investigation.  Furthermore, the denial of job referral opportunities claim is one that is different in kind from the "passed over for promotion" allegation in the Local 30 Complaint.  Those allegations presumably refer to Starrett's failure to

promote Langford into a boiler operator position and a maintenance mechanic, not a failure of Local 30 to refer Langford to a job commensurate with her qualifications through its hiring hall. (*See* Compl. ¶¶ 54, 64.)  Accordingly, the denial of job referral opportunities claim is barred for failure to exhaust administrative remedies.

As for Langford's retaliation claim, Local 30's argument about her failure to check the box for retaliation is unpersuasive on its own, as that factor is not dispositive.  *See, e.g.*, *Jenkins v. New York City Transit Authority*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) (denying motion to dismiss retaliation claim even though plaintiff did not check the box for "retaliation"). Nevertheless, this claim is also barred for failure to exhaust administrative remedies.  The retaliation claims rely on the post-Starrett denial of job referrals as the mode of retaliation, (*see* Compl. ¶¶ 84, 95), and therefore are not "reasonably related" to the Local 30 Complaint for the same reasons stated above.

### B.  Claims Against Starrett

Initially, Starrett contends that all claims against it must be dismissed because it was "put in the position of defending this matter in two separate forums."  (Starrett Mem. at 8.)  Starrett cites no authority in support of this argument.  Instead, Starrett merely recounts the applicable timeline: the administrative law judge ("ALJ") issued a Recommended Order of Dismissal of Langford's NYSDHR complaint on February 12, 2010, Langford filed her complaint on March 1, 2010, and the Commissioner of the NYSDHR adopted the ALJ's Recommended Order on March 15, 2010, issuing a Final Order of Dismissal for Administrative Convenience.  (*Id.* at 7-8.) Because the commencement of this action predates the Final Order by two weeks, Starrett contends that all claims must be dismissed.

Presumably, Starrett intended to invoke New York's election-of-remedies provision,

N.Y. Exec. Law § 297(9), [9] which provides, in relevant part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall
> have a cause of action in any court of appropriate jurisdiction for damages, . . .
> and such other remedies as may be appropriate, . . . unless such person had filed a
> complaint hereunder or with any local commission on human rights, or with the
> superintendent pursuant to the provisions of section two hundred ninety-six-a of
> this chapter, provided that, where the division has dismissed such complaint on
> the grounds of administrative convenience, on the grounds of untimeliness, or on
> the grounds that the election of remedies is annulled, such person shall maintain
> all rights to bring suit as if no complaint had been filed with the division.

Normally, this provision precludes a plaintiff from seeking relief in a state court once he files a

complaint with the NYSDHR.  *See, e.g.*, *Collins v. Manufacturers Hanover Trust Co.*, 542 F.

Supp. 663, 672-73 (S.D.N.Y. 1982).  In this case, however, Starrett's argument fails with respect

to the state-law claims.  When NYSDHR dismisses a complaint for administrative convenience,

it provides an exception to the election-of-remedies bar.  *Giuntoli v. Garvin Guybutler Corp.*,

726 F. Supp. 494, 504 (S.D.N.Y. 1989).  This is so even when the dismissal is suggested by the

plaintiff.  *See Rivers v. Standard & Poor's Corp.*, 764 F. Supp. 54, 56 (S.D.N.Y. 1991); *Giuntoli*,

726 F. Supp. at 504-06.  The statute itself provides that an administrative-convenience dismissal

gives a plaintiff "all rights to bring suit *as if no complaint had been filed with the division*."

N.Y. Exec. Law § 297(9) (emphasis added).  Thus, the election-of-remedies bar does not apply

to this case.  Starrett's argument also fails with respect to the Title VII claims, which are not

subject to New York's election-of-remedies provision.  *Voutsis v. Union Carbide Corp.*, 452

F.2d 889, 894 (2d Cir. 1971) ("The harsh and technical procedural rule of election of remedies is

not applicable to a Title VII civil rights plaintiff . . . .") (internal citation and quotation marks

---

[9] The only authority Starrett cites in support of this argument is *Holtz*, 258 F.3d at 83, which contains no discussion
of a party defending in two forums at the same time.

omitted).  The Court therefore considers Starrett's arguments against each of Langford's claims in turn.

    **i.  Hostile Work Environment**

Like Local 30, Starrett argues that Langford's hostile work environment claims are time-barred because she failed to provide concrete dates for discriminatory incidents.  (*See* Starrett Mem. at 6-7; Starrett Reply at 3-5.)  For the same reasons that Langford's hostile work environment claims against Local 30 are not time-barred, however, her claims against Starrett are also not time-barred.

Starrett also argues that "there were no facts or allegations regarding a hostile work environment which Plaintiff now attempts to raise" in the Starrett Complaint and that therefore, the hostile work environment claims against Starrett must be dismissed.  (Starrett Mem. at 7.)  This argument need not detain the Court for long, as the Starrett Complaint plainly shows otherwise.  The Starrett Complaint mentions a "hostile work environment" multiple times, "racial epithet," and that Langford "was subjected to provocative sexually explicit pictures for over 3 years displayed in the mens' locker room."  (Compl. Ex. A.)  This is sufficient to alert the EEOC to her hostile work environment claims.

Finally, Starrett contends that Langford has failed to state a hostile work environment claim.  But Starrett's argument rests on the erroneous presumption that the only events that could support her hostile work environment claim are those with specific dates attached to them that are within the 300-day period.  (*See* Starrett Reply at 8.)  As discussed above, under *Morgan*, because events contributing to Langford's hostile work environment claim are alleged to have occurred during the 300-day period, events that would otherwise be time-barred are included in the claim.  Accordingly, the Court rejects this argument as well.

### ii.  Failure To Hire

The only timely incident that could support a failure to hire claim is Starrett's hiring of a white male with less experience than her for the maintenance mechanic position for which she applied on April 30, 2007.  (Compl. ¶ 64.)  Starrett argues that because it "tested for the maintenance mechanic position and did not just hand it out to a white male" and because "Plaintiff clearly does not state that she tested or scored better than the other applicants," (Starrett Reply at 5), Langford "simply was not the best qualified employee for the position she applied for before she left."  (Starrett Mem. at 10.)  Therefore, Starrett contends that Langford cannot "state a prima facie case of race or gender discrimination" and her claim must be dismissed as a matter of law.  (Starrett Reply at 5.)

This argument does not suffice to dismiss Langford's complaint.  Starrett misunderstands the threshold Langford must meet at this stage of the litigation for her claim to survive.  The Second Circuit has explained that "*Swierkiewicz* does not require [a discrimination plaintiff] to plead facts sufficient to establish a prima facie disparate treatment claim."  *Boykin*, 521 F.3d at 212.  Therefore, Langford "need only satisfy Rule 8(a)'s standard of a short and plain statement of the claim showing that [she] is entitled to relief."  *Id.* at 213 (internal quotation marks omitted).  Here, Langford "meets the Rule 8 pleading standard, as adopted by *Swierkiewicz,* because she pled facts regarding the events leading to her non-hiring, provided relevant dates, and included the . . . nationalities of at least some of the relevant persons involved with her non-hiring."  *Gadson v. Long Island Jewish Hospital*, No. 05-CV-4768 (NGG)(LB), 2007 WL 879654, at *3 (E.D.N.Y. Mar. 21, 2007) (internal quotation marks omitted).  Specifically, Langford pled that Starrett had failed to remedy a hostile work environment despite her complaints (Compl. ¶¶ 41-46), that she applied for the position as a maintenance mechanic on

April 30, 2007, and that Starrett hired a white male for the position despite her having more

experience.  (Compl. ¶ 64.)  Such allegations are sufficient to give "fair notice of the basis for

[her] claims" and therefore sufficient to satisfy *Swierkiewicz*'s standard.  *Swierkiewicz*, 534 U.S.

at 514.  To the extent that Starrett claims that the failure-to-hire claim is not meritorious because

of the test it administered, "claims lacking merit may be dealt with through summary judgment

under Rule 56."  *Id.* at 514.

## IV. Section 1981 Claims

Local 30 argues that Langford's claims under 42 U.S.C. § 1981 must be dismissed

because they fail to identify any contractual relationship that is impaired by the discrimination

alleged in the Complaint.  (Local 30 Mem. at 16-18.)  Local 30's argument relies on the Supreme

Court's decision in *Domino's Pizza v. McDonald*, 546 U.S. 470, 476 (2006).  In *Domino's Pizza*,

the sole shareholder of a corporation brought suit against defendant Domino's Pizza

("Domino's") under section 1981, alleging that Domino's had broken its contracts with the

corporation because of racial animus toward him.  *Id.* at 473-74.  The Court held that "[a]ny

claim brought under § 1981 . . . must initially identify an impaired "contractual relationship,"

under which the plaintiff has rights."  *Id.* at 476 (internal citation omitted).  Because "it is

fundamental corporation and agency law . . . that the shareholder and contracting officer of a

corporation has no rights and is exposed to no liability under the corporation's contracts," the

Court held that even though the plaintiff had pled a contractual relationship between his

corporation and Domino's, that did not extend the right to bring a Section 1981 claim to him.  *Id.*

at 477.

Local 30 claims that *Domino's Pizza* applies to this case because plaintiff has not

specifically identified on which contractual relationship her section 1981 claim is based, which,

according to Local 30, "begs the question what [plaintiff's] undefined § 1981 claim is about." (Local 30 Mem. at 18.)  A fair reading of the complaint, however, makes it clear that plaintiff's section 1981 claims are employment discrimination claims.  (*See* Compl. ¶¶ 100-104; *see generally* Compl. ¶¶ 27-76).  Indeed, Langford takes this position in her opposition.  (Pl.'s Opp'n at 26-28.)  Local 30 does not appear to contest Langford's characterization of her claims or to contend that her pleading of an employment discrimination claim would be insufficient under section 1981.  (*See* Local 30 Reply at 7.)  Instead, Local 30 argues that "[i]n that case, plaintiff's § 1981 hostile environment claim suffers from the same defects as her Title VII hostile environment claim."  (*Id.*)  The Court, however, has already addressed Local 30's arguments regarding plaintiff's Title VII hostile work environment claims above.  Plaintiff's section 1981 claims, therefore, survive.[10]

## V.  State and City Law Claims

Local 30 makes three arguments against Langford's state and city law claims.  First, Local 30 argues that the claims are preempted by section 301 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 185.  Second, Local 30 argues that they are preempted by the federal duty of fair representation.  Third, Local 30 argues that Langford failed to plead these claims properly.

### A.  Preemption Under § 301 of the NLRA

Local 30 first asserts that Langford's state and city law claims are preempted by section 301 of the LMRA, 29 U.S.C. § 185.  In relevant part, that section provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this

---

[10] The parties also dispute whether the statute of limitations for the section 1981 claims is three or four years.  It is unnecessary to resolve this dispute at this time, as even if the shorter statute of limitations applies, Langford's claims would nevertheless survive.  Three years prior to the filing of the complaint is March 1, 2007, which is before the April 7, 2007 date the Court analyzed with respect to the Title VII claims.

chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  Section 301 of the LMRA preempts state-law claims "if the resolution of [the] state-law claim depends upon the meaning of a collective-bargaining agreement."  *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06 (1987); *see also Foy v. Pratt & Whitney Group*, 127 F.3d 229, 233 (2d Cir. 1997) ("Where the resolution of a state-law claim depends on an *interpretation* of the collective-bargaining agreement, the claim is preempted." (emphasis in original)).  "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law" and it is the "legal character of a claim, as 'independent' of rights under the collective-bargaining agreement," as opposed to its factual content, "that decides whether a state cause of action may go forward."  *Livadas v. Bradshaw*, 512 U.S. 107, 123-24 (1994).  Therefore, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished," *Livadas*, 512 U.S. at 124, although "[t]he boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive."  *Wynn v. AC Rochester*, 273 F.3d 153, 158 (2d Cir. 2001).

In support of its argument that Langford's claims are preempted by section 301, Local 30 cites two cases.  (*See* Local 30 Mem. at 19-20.)  Both are distinguishable.  In *Cooper v. Wyeth Ayerst Lederle*, 34 F. Supp. 2d 197, 202 (S.D.N.Y. 1999), the complaint included allegations that "that the Union failed to appropriately address her claims of [her supervisor's] harassment and abuse, and that plaintiff's grievance against [her supervisor] was not properly addressed or resolved."  The court found therefore that "[r]esolving these claims will require this Court to interpret provisions of the collective-bargaining agreement: for example, how the Union should

29

address employee grievances" and that the plaintiff's state-law claims were preempted.  *Id.*  In *Fenn v. Verizon Communications, Inc.*, No. 08 Civ. 2348 (PGG), 2010 WL 908918, at *5 (S.D.N.Y. Mar. 15, 2010), the court found that the plaintiff's state-law discrimination claim was preempted because "[w]hether the Union Defendants' failure to file a grievance on [the plaintiff's] behalf was an act of discrimination under state law depends, in part, on whether the CBA permitted or required them to do so."  Because Langford's claim also involves a state-law discrimination claim, Local 30 argues that it, too, must be preempted.

It is "clear," however, "that the claim of *discrimination* does not necessarily require interpretation of [a collective-bargaining agreement]."  *Bryant v. Verizon Communications*, 550 F. Supp. 2d 513, 529 (S.D.N.Y. 2008) (emphasis in original).  Unlike *Cooper* or *Fenn*, this case does not involve a union member's dispute about whether the union followed the proper procedures prescribed by the collective-bargaining agreement regarding grievances.  Instead, Langford's principal claim in this case is that union members administering her apprenticeship program engaged in discriminatory conduct against her through their use of racial epithets, disparate work assignments, and display of sexually suggestive images.  With respect to this sort of claim, "[t]he right to be free from such discrimination arises from state law, not from the CBA, and it is a non-negotiable right."  *Bryant*, 550 F. Supp. 2d at 529 (citing *Livadas*, 512 U.S. at 123).  Langford's state and city law claims, therefore, are not "disguised claim[s] for breach of the CBA." [11]  *Wynn*, 273 F.3d at 159.

---

[11] In its reply, Local 30 attempts to point to specific provisions of the CBA that the Court must interpret in order to decide Langford's claims.  First, Local 30 characterizes Langford's "principal claim" as one asserting "that Local 30 improperly sought to shorten the term of her apprenticeship, which she alleges should have lasted forty-two months pursuant to the terms of the Local 30-Starrett CBA."  (Local 30 Reply at 7.)  But Langford has no such claim.  The only claim she has that relates to termination of her employment is her constructive discharge claim, which requires that she show "that her employer deliberately and discriminatorily created work conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign," not that the CBA entitled her to forty-two months of employment.  *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006) (internal quotation marks omitted).  Second, because Sullivan filed a grievance that "allege[d] a violation of the CBA's Apprentice

Accordingly, the Court is not persuaded by Local 30's arguments for preemption under section 301 of the LMRA, and Langford's claims are not preempted on those grounds.

## B. Preemption by the Duty of Fair Representation

Local 30's second argument against Langford's state and city law claims is that they are preempted by the federal duty of fair representation ("DFR").  The DFR is "a statutory obligation [for an exclusive bargaining representative] to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  *Vaca v. Sipes*, 386 U.S. 171, 177 (1966).  That obligation was developed "in a series of cases involving alleged racial discrimination by unions certified as exclusive bargaining representatives under the Railway Labor Act, and was soon extended to unions certified under the N.L.R.A."  *Id.* (internal citations omitted).  It is "derived from sections 8(b) and 9(a) of the NLRA, 29 U.S.C. §§ 158(b) and 159(a), which authorize a union to act as the exclusive representative of all the employees in the collective bargaining process."  *Snay v. U.S. Postal Service*, 31 F. Supp. 2d 92, 99 (N.D.N.Y. 1998).  "The Second Circuit has not addressed the issue" of whether the NYSHRL is preempted by the DFR.  *Bryant*, 550 F. Supp. 2d at 527.  Local 30 argues, however, that the weight of district court authority weighs in favor of a finding of preemption.  Plaintiff argues that the cases Local 30 cites are distinguishable

---

Schedule relating to length of service in excess of forty-two months . . . to the extent the Court finds it necessary to determine whether the grievance had merit, . . . the Court would have to interpret the CBA."  (*Id.* at 8.)   The question here, however, is not whether the grievance was meritorious.  To the extent that the grievance is relevant at all, it is because it gives rise to an inference of discrimination.  This depends not so much on the accurate construing of the CBA, but on the motivation involved in initiating the grievance against Langford, and is therefore not grounds for preemption.  *Cf. Wynn*, 273 F.3d at 158 (noting that in a case involving state-law claims of fraud that "what matters is not so much the accurate construing of the CBA, but plaintiffs' understanding of its provisions, and the basis of that understanding" (quoting *Foy*, 127 F.3d at 235)).  Finally, Local 30 argues that "plaintiff's attempt to assert some sort of failure to promote claim against Local 30 requires the Court to further interpret the CBA."  (Local 30 Mem. at 8 (internal citation omitted)).  Because the Court has not construed Langford's claim to include a failure-to-promote claim against Local 30, this argument is moot.

because her claim is not one that the union discriminated in its representative capacity, but that it discriminated directly against her in its operation of the apprenticeship program.

The vast majority of cases in this Circuit, when dealing with state-law claims of discrimination against a union, have found such claims to be subsumed by the DFR.   In *Snay*, for example, the plaintiff alleged that her union discriminated against her when it failed to fully process her grievances and misled her about the processing of her grievances; she brought claims under the NYSHRL.  *Snay*, 31 F. Supp. 2d at 99-100.  The court there found that "[b]ecause the alleged discrimination was in connection with the Union's activities as representative, the discrimination claim cannot be said to 'arise wholly outside the ambit of those obligations circumscribed by a union's duty of fair representation under the collective bargaining agreement.'"  *Id.* (citing *Condon v. Local 2944, United Steelworkers of America*, 683 F.2d 590, 595 (1st Cir. 1982)).  Other cases in this Circuit largely followed the same rationale.  *See, e.g.*, *Cole v. Central Park Systems, Inc.*, No. 09-CV-3185 (RRM)(CLP), 2010 WL 3747591, at *8 (E.D.N.Y. Sept. 20, 2010) (noting that with respect to plaintiff's claim that his union arbitrarily failed to process his grievances that "where, as here, a state law claim gives no new rights to the employee and imposes no new duty on the union, it is preempted"); *Fenn*, 2010 WL 908918, at *6 ("To the extent that union representatives violated state laws by treating him differently than other members because of his gender or religion, they also violated the federal duty of fair representation.") (internal quotation marks omitted); *Cabrera v. NYC*, 436 F. Supp. 2d 635, 646 (S.D.N.Y. 2006); *Angrisani v. Long Island R.R.*, No. CV-01-8453 (SJF)(MDG), 2005 WL 1311798, at *7 (E.D.N.Y. June 1, 2005) ("Plaintiff's state law claims against UTU, which, in essence, challenge its failure to file a grievance on her behalf, seek to vindicate the same rights as those protected by the federal duty of fair representation and impose no obligation on the

union that is not already required by the duty of fair representation."); *Zuckerman v. Volume Services America, Inc.*, 304 F. Supp. 2d 365, 373 (E.D.N.Y. 2004) (same); *Marrero v. City of New York*, No. 02 Civ. 6634 (DLC), 2003 WL 1621921, at \*3 (S.D.N.Y. Mar. 28, 2003); *Agosto*, 107 F. Supp. 2d at 310-11; *Rodolico v. Unisys Corp.*, 96 F. Supp. 2d 184, 188-89 (E.D.N.Y. 2000) ("As the duty of fair representation unquestionably forbids a union from discriminating against its members in its representative capacity, the contribution claim under the NYHRL cannot be said to create a new right, and is thus subsumed by the duty of fair representation." (internal citation omitted)); *Hess v. B&B Plastics Div. of Metal Cladding, Inc.*, 862 F. Supp. 31, 33-34 (W.D.N.Y. 1994).  *But see Parker v. Metropolitan Transportation Authority*, 97 F. Supp. 2d 437, 448-49 (S.D.N.Y. 2000) ("*Vaca* does not dictate that the existence of a generalized obligation not to discriminate under the duty of fair representation results in the preemption of all other discrimination claims. To hold otherwise would render *Goodman* [*v. Lukens Steel Co.*, 482 U.S. 656 (1986)] meaningless, since Title VII claims—which by definition invoke rights that also exist under the duty of fair representation—would be preempted in every case.").

Plaintiff contends that these cases are distinguishable because she "does not challenge Local 30's failure to file a grievance on her behalf. She is directly challenging the union's discriminatory operation of its apprenticeship program."  (Pl.'s Opp'n at 30.)  Although plaintiff does not cite any authority to illuminate the Court as to why this distinction makes any difference, there does appear to be some case law on point.  In *Santos v. Harver Co.*, No. CV 08-1206-C, 2009 WL 2184543 (D. Or. May 29, 2009), the plaintiff, Rachel Santos, was accepted into a union apprenticeship program.  The union then refused to credit her previous experience, refused to give her credit for work she performed, and assigned her cleaning duties instead of

more substantive work assignments, all allegedly on the basis of her gender.  *Id.* at *2.  In

analyzing whether the DFR preempted claims brought under Oregon state law, the court found:

> Santos has not alleged a claim for breach of the federal-law duty of fair
> representation.  Santos does not allege that the Labor Contract is discriminatory or
> that the [defendant] Painters' Union did not act with complete good faith and
> honesty in negotiating or enforcing the Labor Contract. . . .   In pursuing her claim,
> Santos is relying on a duty . . . not unique to the Painters' Union as Santos's
> representative under the NLRA.  Therefore Santos's state-law claim . . . is not
> completely preempted by the federal-law duty of fair representation . . . .

*Id.* at *10.  Similarly, in *Swain v. Dywidag-Systems Int'l USA, Inc.*, No. C 09-01096 JW, 2009

WL 1578918 (N.D. Cal. June 4, 2009), the plaintiff also enrolled in an apprenticeship program.

She alleged that she was subjected to sexual harassment at one of the jobs to which she was

assigned through the apprenticeship program, and complained of the conduct to union officials.

*Id.* at *1-2.  When she did, the union officials, who held the power to assign jobs through the

apprenticeship program, told her that if she pursued the matter she would not be assigned to any

jobs; eventually she was "blacklisted" and kicked out of the union.  *Id.* at *2.  After pleading for

reinstatement, the plaintiff was reinstated but involuntarily placed on medical leave by union

officials.  *Id.*  Like the NYSHRL, the relevant state statute there, Cal. Gov't Code § 12940,

"prohibit[s] a labor organization or individual from discriminating on the basis of sex in the

selection of, training or discharge of a person in an apprenticeship training program."  *Swain*,

2009 WL 1578918, at *5; *cf.* N.Y. Exec. Law § 296(1-a)(c) (prohibiting a "labor

organization . . . controlling apprentice training programs" from "discriminat[ing] against . . . a

person in the terms, conditions or privileges of such programs because of race, creed, color,

national origin, sexual orientation, military status, sex, age, disability or marital status").  The

court there found that the union officials "engaged in conduct that itself was discriminatory and

constituted retaliation for her opposition to the conduct" of her supervisor, and that therefore the

plaintiff's claims were not preempted by the DFR.  *Swain*, 2009 WL 1578918, at *6.  *Swain* and *Santos*, both of which address DFR-related preemption of state-law claims in the context of union-operated apprenticeship programs, appear to be the cases most on point.

It is true that some of the cases from our Circuit contain language that, on its face, is expansive enough to cover this case.  *See, e.g.*, *Cole*, 2010 WL 3747591, at *8 ("Discrimination claims against unions and individual union representatives brought pursuant to New York State and City statutes do not lie.").  None of these cases, however, squarely address the situation presented in this case, in which a union is sued not because of actions involving the enforcement of a CBA, but instead due to its operation of an apprenticeship program.  In the latter situation, the DFR is not implicated because no "representation" is involved.  Accordingly, the Court declines to find that Langford's claims are preempted.

### C.  Failure To Plead Properly

Finally, Local 30 contends that Langford's failure to plead her state and city law claims according to the rule of *Martin v. Curran*, 101 N.E.2d 683 (N.Y. 1951), which held that in common-law actions against unincorporated associations, such as unions, "individual liability of every single member [must] be alleged and proven."  101 N.E.2d at 686.  Plaintiff, again without citation, does not argue that she has satisfied *Martin*'s pleading requirements, but rather argues that they are inapplicable to this action, which arises out of statutory causes of action, not common-law causes of action.  (Pl.'s Mem. at 31-34.)  Based on its review of the case law, the Court agrees with plaintiff.

In support of its argument, Local 30 cites two cases from our Circuit that required plaintiffs asserting causes of action under the NYSHRL to conform to *Martin*'s pleading requirements.  First, in *Girolamo v. Teamsters Local 72*, No. 97 Civ. 9412, 1998 WL 889039

(S.D.N.Y. Dec. 21, 1998), the court dismissed the plaintiff's state-law discrimination claims in a

brief discussion, the entirety of which is reproduced here:

> Defendants also contend that plaintiff's state law claim against Local 72 must be
> dismissed because plaintiff failed to allege that Local 72 members ratified the
> allegedly discriminatory conduct.  Liability of an unincorporated association, such
> as a labor union, is that of each member individually.  A cause of action under
> state law against a labor union may be maintained only if it is provable against
> each member.  *See Martin v. Curran*, 303 N.Y. 276, 281, 101 N.E.2d 683 (1951);
> *R.M. Perlman, Inc. v. Local 89-22-1, I.L.G.W.U.*, 789 F. Supp. 127, 131-32
> (S.D.N.Y.1992).

> Plaintiff has not alleged that all members of Local 72 authorized or participated in
> the allegedly discriminatory conduct.  Therefore, plaintiff's claim under § 296 of
> the New York Human Rights Law against Local 72 is dismissed.

*Girolamo*, 1998 WL 889039, at *9.  Second, in *McIntyre v. Longwood Central School District*,

No. 07-CV-1337 (JFB)(ETB), 2008 WL 850263 (E.D.N.Y. Mar. 27, 2008), the court, after

holding that the NYSHRL cause of action should be dismissed because the defendant was not an

"employer" within the meaning of the statute, held alternatively that "the claim [was] . . . fatally

flawed because, as the Second Circuit has noted, it is well-established that '[New York] state law

makes an unincorporated association liable for the torts of its members only where the unlawful

acts are authorized or ratified by each member of the association.'"  2008 WL 850263, at *12-13

(quoting *Modeste v. Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU,*

*AFL-CIO*, 38 F.3d 626, 627 (2d Cir. 1994)).  *McIntyre* also cited *Girolamo*.

McIntyre* and *Girolamo*, however, are based on an apparently overbroad reading of

*Martin*'s holding.  *Martin* did hold that suits against unincorporated associations had to plead the

individual liability of every single member under N.Y. Gen. Ass'ns Law § 13.  *Martin*, 101

N.E.2d at 686.  But that decision did so in the context of common-law causes of action,

specifically referring to tort and contract actions.  *See id.* ("So, for better or worse, wisely or

otherwise, the Legislature has limited such suits against association officers, whether for

breaches of agreements or for tortious wrongs, to cases where the individual liability of every single member can be alleged and proven."). The *Martin* court traced the statutory origins of N.Y. Gen. Ass'ns Law § 13, and found that the New York Court of Appeals had "uniformly held" that the precursors to that statute "require[d] pleading and proof of authorization or ratification by all the members of the group." *Id.* at 685. This was because, at common law, an unincorporated association was "not an artificial person, and has no existence independent of its members." *Id.* The court further noted that it "does not revise statutes, in an effort to eliminate seeming injustices, or to bring the law into accord with modern fact. . . . It is for the Legislature to decide whether or not to overhaul these settled rules . . . ." *Id.*

The decision in *Martin*, therefore, is heavily tied in with common-law principles. Thus, in *People v. Newspaper and Mail Deliverers' Union of New York and Vicinity*, 683 N.Y.S.2d 488 (N.Y. App. Div. 1998), the First Department found *Martin* to be inapplicable to a union's statutory liability. The court held that the enactment of Penal Law article 460, coupled with a statutory definition of "persons" who could be liable that included unincorporated associations, evinced an intent of the New York Legislature to bring "the law into accord with modern fact." *Id.* at 492. The court further found that *Martin*'s "literal application in the current . . . context would clearly frustrate the legislative intent behind the enactment of Penal Law Article 460." *Id.* at 492-93.

Those same principles counsel in favor of refraining from applying *Martin*'s pleading requirements to the case at bar. N.Y. Exec. Law § 296(1-a)(c) specifically provides:

> 1-a. It shall be an unlawful discriminatory practice for an employer, *labor organization*, employment agency or any joint labor-management committee controlling apprentice training programs: . . .
>> (c) To discriminate against any person in his or her pursuit of such programs or to discriminate against such a person in the terms, conditions or privileges of such programs because of race, creed, color, national

37

origin, sexual orientation, military status, sex, age, disability or marital status;

(emphasis added).  When the statute specifically charges labor organizations such as Local 30 with liability for discriminatory practices in apprenticeship programs, it has evinced the Legislature's judgment that for the purposes of the statute, contrary to *Martin*'s holding, that the labor organization does have an existence independent of its members.  Moreover, applying *Martin* to this statute would clearly frustrate the legislative intent behind its enactment, as it would elevate the standard of proof in any action under it to a level that the *Martin* court itself questioned.  *See Martin*, 101 N.E.2d at 686.  The Court therefore finds *McIntyre* and *Girolamo* unpersuasive, as they are not "consistent with *Martin v. Curran* because liability [in these decisions] is predicated on a statute which, by definition, has altered the common law."[12] Mitchell H. Rubenstein, *Union Immunity from Suit in New York*, 2 N.Y.U. J.L. & Bus. 641, 658 (2006).  Accordingly, the Court finds neither decision persuasive and declines to dismiss Langford's state and city law claims.

---

[12] An examination of the support cited in *McIntyre* and *Girolamo* confirms that their application of *Martin* to claims under the NYSHRL is unwarranted.  In *R.M. Perlman*, cited in *Girolamo*, the state-law claims at issue were "prima facie tort, several counts of intentional interference with contractual relations, and defamation," common-law claims to which *Martin* clearly applies. 789 F. Supp. at 129.  In *Modeste*, the state-law claims "ar[o]se from intentional torts allegedly inflicted by members of the Union during a strike."  38 F.3d at 627.  Neither decision offers any support for the proposition that *Martin* applies to statutory causes of action like those under the NYSHRL, and neither *McIntyre* nor *Girolamo* offer any explanation as to why such application is appropriate.

## CONCLUSION

For the foregoing reasons, the motions to dismiss **[11, 14]** are GRANTED in part and

DENIED in part.  Langford's denial of job referral opportunities and retaliation claims against

Local 30 are dismissed.  The remainder of her claims survive.


SO ORDERED.

Dated: New York, New York
      February **16**, 2011

                                    Richard J. Holwell
                              United States District Judge